[Cite as *State v. Neil*, 2016-Ohio-4762.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 14AP-981 |
| | | (C.P.C. No. 12CR-5963) |
| v. | : | and |
| | | No. 15AP-594 |
| Miguel E. Neil, | : | (C.P.C. No. 13CR-4174) |
| Defendant-Appellant. | : | (REGULAR CALENDAR) |

D E C I S I O N

Rendered on June 30, 2016

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Valerie B. Swanson*, for appellee. **Argued:** *Valerie B. Swanson*.

**On brief:** *Yeura R. Venters*, Public Defender, and *John W. Keeling*, for appellant. **Argued:** *John W. Keeling*.

**On brief:** *Miguel E. Neil*, pro se.

APPEALS from the Franklin County Court of Common Pleas

DORRIAN, P.J.

{¶ 1} Defendant-appellant, Miguel E. Neil, appeals from judgments of conviction and sentence entered by the Franklin County Court of Common Pleas pursuant to jury verdicts finding appellant guilty of 30 counts of robbery and 6 counts of kidnapping. For the reasons that follow, we affirm.

## I. Facts and Procedural History

{¶ 2} The charges against appellant arose from a series of robberies that occurred in 2011 and two robberies that occurred in 2012. On November 15, 2012, immediately following the final robbery, Columbus police arrested appellant. Appellant was indicted in common pleas court case No. 12CR-5963 on 4 counts of robbery and 6 counts of

kidnapping arising from the 2012 robberies.  He also was indicted in common pleas court case No. 13CR-4174 on 26 counts of robbery and 1 count of kidnapping arising from 13 separate robberies committed in 2011.  Pursuant to motion filed by plaintiff-appellee, State of Ohio, the trial court joined the indictments for a single trial.  Appellant moved to sever the indictments but the trial court denied the motion.  Appellant also moved to suppress certain evidence but the trial court denied that motion.  The charges were tried to a jury during a six-day trial beginning September 24, 2014, and ending October 1, 2014.

**A. Robberies Committed in 2011**

{¶ 3}  The state presented witness testimony, as well as video and photographic evidence, related to the 13 robberies the state alleged appellant committed in 2011.

{¶ 4}  On March 23, 2011, a Subway restaurant at 3626 Gender Road was robbed. An employee testified that at approximately 9:30 p.m., a man dressed in all black and brandishing a small handgun entered the restaurant demanding money.  The robber wore a hood and a mask covering his face; the employee could only see from the bridge of the robber's nose up because the lower portion of the robber's face was covered by the mask. The robber ordered the employee to get on the floor and not to look at him.  The robber then reached over the counter into the cash register, which the employee had opened. The robber did not jump over the counter or step into the area behind the counter.  The employee testified that the robber was a dark-skinned African-American man with a normal build, approximately 5'10" to 6" tall, weighing 180 to 220 pounds.  The state also introduced photos taken from the restaurant's security camera. In the photos, the robber, who is wearing dark clothing, including a hood and mask, dark shoes, and dark gloves with white markings or letters, can be seen pointing a handgun, which is held in his left hand.

{¶ 5}  On April 18, 2011, a Subway restaurant at 354 West Third Avenue was robbed.  A customer who was present that evening testified that a man entered and announced that he was robbing the restaurant.  The robber then ordered the customer and employees to get down on the floor.  When the customer did not move, the robber pushed him down to the floor.  The robber then took two Subway employees into the area behind the cash register.  The customer testified that the robber was an African-American man with a medium-to-dark complexion and a deep voice.  He stated that the robber wore

dark gloves and a very dark blue hooded sweatshirt with the drawstring pulled so that only part of his face and mouth were visible.  The customer testified that the robber was medium height and "had a potbelly or close to it."  (Sept. 25, 2014 Tr. at 138.)  One of the two employees who were present testified that the robber entered the store holding a small gun, pointed the gun at the back of the customer's head, and told the employee to go to the front of the store and get the money.  She testified that the robber was wearing dark colors and she could only see his eyes.  She stated that the robber made them all get down on the floor, then took the money from the register and left.  A video of the robbery from the restaurant's surveillance system was played for the jury, with the employee narrating the events depicted.  The employee pointed out that the robber held the gun in his left hand.  The second employee who was present during the robbery also testified.  She indicated that the robber was wearing gloves and carrying a handgun, and that he used his right hand to take money out of the cash register.  She said that the robber was an African-American male with a deep voice and that she believed he was approximately 5'8" tall.

{¶ 6}   On May 8, 2011, a Tim Horton's restaurant at 6780 East Main Street was robbed.  An employee of the restaurant testified that the robbery occurred near the end of his shift, around 9:10 p.m.  He testified that the robber was an African-American male who wore a black ski mask, black hooded sweatshirt, black pants, and brown or black gloves, and carried a small handgun in his left hand.  He testified that the robber entered the restaurant, took another employee at gunpoint, and went to the drive-through area where he was working.  The robber then ordered him to open the register and get on the ground.  After removing the money from the drive-through register, the robber took the other employee back to the front of the restaurant, ordered him to open the register, and then ordered him to get on the ground.  A video from the restaurant's surveillance system was played for the jury. In the video, the robber could be seen wearing dark gloves with white markings or letters.  The video also depicted the robber walking behind the counter and removing money from the cash register with his right hand while holding a handgun in his left hand.

{¶ 7}   On June 28, 2011, a Tim Horton's restaurant at the corner of Sawmill Road and Hard Road was robbed.  An employee testified that just before the restaurant closed,

at about 10:58 p.m., an African-American man entered the store and got past the counter. The robber had a gun in his left hand; he pointed it at the employee and ordered him to open the cash registers. The employee opened the cash registers and then got on the ground. The robber used his right hand to empty the cash registers. The robber wore dark clothing and black gloves with white markings or letters. The employee testified that he could only see from the top of the robber's nose to his eyebrows because the lower part of his face was covered. He stated that the robber was dark skinned, approximately 5'11" to 6'0" tall and "had a little bit of a build to him." (Sept. 25, 2014 Tr. at 194.) A second employee, who was also present during the robbery, testified that the robber walked in carrying a small handgun and demanded money. The robber ordered the two employees to get down on the floor and then made one of them open the cash registers. The second employee testified that he tried to press an alarm button, but the robber came over, pointed the gun at him and told him to stay down. A video from the restaurant's surveillance system was also played for the jury.

{¶ 8} On August 10, 2011, a Subway restaurant at 7558 Worthington-Galena Road was robbed. An employee of the restaurant testified that around 9:30 p.m., as she was preparing to close the restaurant, a man entered and ordered her to give him all the money. The robber jumped over the counter and forced her to open the cash register; he then kneed her in the back and ordered her to get on the ground. The employee testified that the robber wore black clothing, including a black mask, hooded sweatshirt, pants, gloves, and shoes. A video from the restaurant's surveillance system was played for the jury. In the video, the robber can be seen wearing black gloves with white markings or letters and holding a gun in his left hand while reaching into the cash register with his right hand. The employee testified that the robber was an African-American male who was taller than she was and indicated that her height was 5'6". She further testified that she was scared during the incident and that shortly thereafter she quit her job because she could not handle working there any longer.

{¶ 9} On the evening of September 11, 2011, a Tim Horton's restaurant at 8333 North High Street was robbed. The employee who was present during the robbery was unavailable at trial due to military service, but the state called the owner/operator of the store as a witness. He testified that he watched the store's surveillance video after the

robbery. The surveillance video was played for the jury. In the video, the robber can be seen entering the restaurant and jumping over the counter. The robber wore dark clothing and black gloves with white markings or letters. In the video, a restaurant employee can be seen getting on the floor. The video shows the robber holding a gun in his left hand and using his right hand to reach into the cash register. The state also presented part of the video from earlier that same evening, when an individual appeared to enter the restaurant, go to the restroom and then leave without purchasing anything. That individual appeared to be holding his hands up to shield his face as he walked through the restaurant. The store owner testified that approximately 15 minutes passed between that individual entering and leaving the restaurant and the robbery occurring.

{¶ 10} On September 13, 2011, a BP gas station at 1263 East Dublin-Granville Road was robbed. An employee testified that sometime between 2:00 and 3:00 p.m., a man entered the store with a gun pointed at him and ordered him to open the cash register. The robber told another employee who was present to get on the ground. During the robbery, a customer entered the store and the robber also told him to get on the ground. He testified that the robber wore a mask, a black hooded jacket, and black gloves. He could only see around the robber's eyes, and testified that the robber was a male with light brown skin. The employee testified that the gun was small and the robber held it in his left hand. The store employee testified that following the robbery, the other employee who was present during the robbery quit her job. A video from the store's surveillance system was played for the jury, in which the robber could be seen walking behind the counter while holding a gun in his left hand. In the video, the robber could be seen wearing dark gloves with white markings or letters and using his right hand to reach into the cash register.

{¶ 11} On the evening of September 17, 2011, a Subway restaurant at 1898 Brice Road was robbed. An employee who was present during the robbery testified at trial. She indicated that she was training a new employee on the night of the robbery. When the robber entered the store, the cash register was open because the employee had been counting out money to put in the safe. She heard the robber demand money and looked up to see a gun in her face. She stepped back, leaving the cash register open; the robber jumped over the counter and grabbed the money from inside the register. The robber

then made her walk to another part of the restaurant to prove there was no cash register there.  The robber told the other employee to lie down on the floor and not look at him.  She testified that the robber was an African-American male with a deep voice, wearing a dark hooded sweatshirt and a bandanna over his mouth area.  A video from the restaurant's surveillance system was played for the jury. In the video, the robber could be seen wearing dark clothes, including dark gloves with white markings or letters.  The video depicted the robber jumping over the counter to reach the cash register, while holding a gun in his left hand, and showed him reaching into the cash register with his right hand to remove the money.

{¶ 12} On October 10, 2011, a Marathon gas station at 7200 Sawmill Road was robbed.  An employee testified that early in the morning a man entered the store with a gun and declared his intention to rob the store.  He then jumped over the counter and ordered the employee to open the cash register.  The robber wore black clothing including a hooded sweatshirt, a face mask or ski mask, and gloves.  The employee testified he could only see the area around the robber's eyes, and that he was a male with dark skin.  He testified that the robber grabbed his collar and punched him in the back when he pressed the panic alarm.  The robber held the gun in his left hand and reached into the register with his right hand to remove the money.  The employee testified that the robber ordered both employees to get on the ground and departed the store after taking the money.  The other employee testified similarly that the robber was an African-American male, approximately 5'7" to 5'10" tall, and that he wore black clothing.  She stated that the robber pushed her to the ground and ordered her to open the store's safe, but she indicated that she did not have the keys to the safe.  A video from the store's surveillance system was played for the jury in which the robber could be seen wearing dark clothing, including dark gloves with white markings or letters, and holding a gun in his left hand.  The video showed the robber jumping over the counter to reach the area where the cash registers were located.

{¶ 13} On October 12, 2011, a Family Video store at 5540 North High Street was robbed.  An employee testified that at approximately 11:30 p.m., shortly before the store closed, a man entered the store, walked behind the counter, and demanded money.  The employee testified that the robber was an African-American male, dressed in all black,

including black gloves. She testified that he told her to open the cash registers and then get on the floor. Before she got down, he wrapped his left arm around her; she felt something against her side that she believed was a gun. The robber used his right hand to remove the money from the cash register. She testified that the robber was approximately 5'6" to 5'7" tall and weighed 150 to 160 pounds. Photographs taken from the store's surveillance system were presented to the jury. In the photographs, the robber could be seen wearing dark clothing and dark gloves with white markings or letters. The robber was depicted standing behind the counter, holding a gun in his left hand, and using his right hand to remove money from the cash register.

{¶ 14} On October 17, 2011, a McDonald's restaurant at 1300 Morse Road was robbed. The shift manager working that evening testified that, at approximately 7:57 p.m., a man entered the store demanding to speak to the manager. The man then ran behind the counter with a gun drawn and told her to open the cash register. After taking the money, the robber told the manager and the other employees to lie down on the floor. The manager testified that the robber wore black clothes, including a hat, hooded sweatshirt, gloves, and a mask covering the lower part of his face. The robber carried a small handgun in his left hand. The manager testified that the robber was an African-American male, approximately 5'8" to 5'10" tall, weighing approximately 180 pounds. A video from the restaurant's surveillance system was played for the jury. In the video, the robber could be seen wearing dark clothing, including dark gloves with white markings or letters. The robber could also be seen holding a gun in his left hand and running behind the counter to reach the cash registers, where he removed the money with his right hand.

{¶ 15} On November 1, 2011, a BP gas station at 7310 Sawmill Road was robbed. An employee who was present during the robbery testified that at approximately 11:00 p.m., a man entered the store and demanded that his co-worker open the cash registers. The robber demanded that the employee get on the ground, then walked over and shoved him down. The employee testified that the robber wore all black clothing, including a hood and mask covering part of his face, black pants, and black gloves. He could only see part of the robber's face around his eyes, but testified that he was an African-American man with dark skin. He testified that the robber was approximately 5'7" to 5'8" tall and weighed approximately 180 pounds. A video from the store's surveillance system was

played for the jury. In the video, the robber could be seen wearing dark clothing, including dark gloves with white markings or letters, and carrying a gun in his left hand. The robber could also be seen walking behind the counter and reaching into the cash registers with his right hand after ordering the employee to open them.

{¶ 16} On November 10, 2011, a PNC bank location at 7644 Sawmill Road was robbed. An employee who was present during the robbery testified that at approximately 9:30 a.m., a man entered the bank, jumped over the counter, and demanded cash from her and another teller. She indicated that after opening her cash drawer, the robber reached in to remove the money. She testified that the robber wore black clothing and had something over his mouth so that she could only see the area around his eyes. She testified that the robber was an African-American male with dark skin. The employee testified that the robber ordered everyone in the bank to get on the floor. She testified that the robber appeared to have "a little bit of a bulk to him." (Sept. 29, 2014 Tr. at 490.) Photographs taken from the bank's surveillance system were presented to the jury, in which the robber could be seen entering the bank dressed in all black, including a mask and hooded sweatshirt. In the photos, the robber can be seen jumping over the counter and he appears to be holding a small handgun in his left hand. The photos also show the robber wearing dark gloves with white markings or letters.

### B. Investigation of 2011 Robberies

{¶ 17} Former Columbus Police Detective Gregory Franken testified that he was assigned to a joint investigative team with Special Agent Craig Brennaman of the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). The purpose of the joint investigative team was to investigate armed serial robberies. Detective Franken was involved in the investigation of the series of robberies that occurred in 2011; investigators came to refer to the suspect in those crimes as the "counter jumper." (Sept. 30, 2014 Tr. at 828.) He testified he developed approximately one dozen potential suspects for the robberies. Detective Franken testified that he began to investigate appellant as a potential suspect in mid-to-late November 2011; part of that investigation involved using GPS tracking devices on appellant's vehicles. No crimes attributed to the "counter jumper" robber were committed during this initial period of GPS surveillance. Special Agent Brennaman testified similarly that he was involved with investigating the series of

robberies committed in 2011. He testified that at some point in the investigation, cell phone records for appellant were obtained and examined to determine whether appellant was in the applicable areas at around the times of the 2011 robberies. The state also introduced evidence from appellant's driver's license indicating that he was 5'9" tall and weighed 222 pounds.

**C. November 8, 2012 Wendy's Robbery**

{¶ 18} On November 8, 2012, a Wendy's restaurant at 1500 Worthington Woods Boulevard was robbed. A manager who was present during the robbery testified that at approximately 9:00 p.m., a man entered the restaurant dressed in all black, including black gloves. He pointed a gun at her head and told the employees to get down on the floor. The robber went behind the counter and made the manager open the cash registers. The manager testified that after taking the money the robber left the restaurant; one of the employees ran after him, but the robber turned and pointed the gun at him and told him to stop running. The manager testified that the robber was approximately 5'7" and weighed about 200 pounds. A video from the restaurant's surveillance system was played for the jury. In the video, the robber could be seen wearing dark gloves with white markings or letters, and holding a gun in his left hand while using his right hand to reach into the cash register.

{¶ 19} Appellant presented a witness to the November 8, 2012 Wendy's robbery who testified that he was parked outside the restaurant eating a sandwich on the evening of the robbery. He saw an individual dressed in dark clothing jog past his car toward a nearby muffler shop. He then heard screaming from Wendy's and watched the individual get into a burgundy late-1990s or early 2000 Astro van parked near the muffler shop. On cross-examination, this witness admitted that he gave a statement to the police indicating that the van was a "maroon, rusty green or dark colored Astro-like van." (Sept. 29, 2014 Tr. at 547.)

{¶ 20} The prosecution also presented testimony from Detective Chris Davis of the Westerville Police Department. Detective Davis testified that he was a patrol officer at the time of the November 8, 2012 Wendy's robbery. After hearing the robbery-in-progress call, he began to drive his patrol cruiser toward the area. His patrol cruiser was equipped with a license plate reader camera. Detective Davis testified that the license plate reader

on his cruiser identified license plate number ERR6711 at 9:07 p.m. on South Cleveland Avenue in the area in front of St. Ann's Hospital. He testified that this location was approximately 2.7 miles from the Wendy's location that was robbed on November 8, 2012.

{¶ 21} Detective Franken testified that following the November 8, 2012 Wendy's robbery, members of the Columbus police contacted the Westerville Police Department and received the license plate reader information described by Detective Davis. As a result of that information, Detective Todd Cress of the Columbus Division of Police prepared an affidavit in support of a second GPS tracking warrant for appellant's vehicles, a black 2004 Dodge Stratus with the license plate number BIGNEIL, and a blue 1995 Ford Aerostar van with the license plate number ERR6711. The affidavit was presented to a judge of the Franklin County Municipal Court and the installation of GPS devices was authorized at 1:13 a.m. on November 9, 2012.

### D. November 15, 2012 Bureau of Motor Vehicles Office Robbery

{¶ 22} On November 15, 2012, an Ohio Bureau of Motor Vehicles office ("BMV office") at 112 Dillmont Drive was robbed. The state presented testimony from two employees of the BMV office and a customer who were present at the time. One of the employees testified that the office closed at 6:30 p.m. Near closing time on November 15, 2012, a man rushed through the door and demanded money. The robber wore a sweatshirt and track pants, a black mask, gloves, and dark shoes. The employee testified that he pointed a small gun at her as he demanded money. She testified that the robber walked behind the counter; she handed him money and then he also grabbed money from another employee. When the office manager emerged from the back room of the office, the robber pointed the gun at her and told her to sit down. The employee testified that the robber was an African-American man, and that he held the gun in his left hand. The other employee testified similarly that the robber ran into the office demanding money and telling the employees to keep their heads down. She testified that the robber was an African-American man, dressed in black clothing, including a hood, mask, and gloves. The customer who was present in the BMV office likewise testified that the robber wore a mask and gloves, and pointed a small handgun at the employees. The prosecution also presented a video of the robbery, taken from the BMV office's surveillance system. In the

video, the robber could be seen dressed in dark clothing, wearing a mask and dark gloves with white markings or letters. The robber held a gun in his left hand and went behind the counter of the BMV office, but instead of reaching into cash registers, he took money directly from the employees who handed it to him.

{¶ 23} Officer Howard Brenner, a member of the Columbus Division of Police SWAT team, testified that he was assigned to follow appellant on the evening of November 15, 2012. He ultimately located appellant's Dodge Stratus parked in a lot near the BMV office, but appellant was not in the vehicle. He then observed an individual matching appellant's description, wearing a dark cap, dark clothes, and shiny tennis shoes walking along Dillmont Road. Officer Brenner testified that he saw that same individual, later identified as appellant, run into the BMV office just as the "open sign" was turned off. (Sept. 29, 2014 Tr. at 642.) Officer Brenner watched as appellant entered the BMV office, moved past the counters, and committed the robbery. Officer Brenner testified that he saw appellant confront the clerks at the BMV office while holding a gun. Officer Brenner and other SWAT officers pursued appellant after he left the BMV office, ultimately arresting appellant after he attempted to flee.

{¶ 24} Detective Franken interrogated appellant following his arrest, along with Columbus Police Detective Dana Farbacher. A videotape of the interrogation, with certain redactions as stipulated by the parties, was played for the jury. During the interrogation, appellant admitted he robbed the BMV office. Appellant stated that "I just figured if I could just get 1,400, I mean, I know how the old saying goes, you know, I'm going to quit, I'm going to quit, you know what I'm saying." (Sept. 30, 2014 Tr. at 719.) Appellant repeatedly denied committing any other robberies; however, he also stated that "I understand it becomes habitual, you know, especially if you get away." (Sept. 30, 2014 Tr. at 728.) During the interrogation, appellant was shown a photographic image taken from the surveillance video at the Tim Horton's that was robbed on September 11, 2011. However, the interrogating detectives did not tell appellant the source of the photograph. When asked what the photograph looked like, appellant responded "[t]hat's my van." (Sept. 30, 2014 Tr. at 734.) Appellant later reiterated, "I'm not going to sit here and tell you that that is not my van, you know, you showed me a picture of my car, you showed me a picture of my van. I'm going to know it." (Sept. 30, 2014 Tr. at 760.)

{¶ 25} When asked about his whereabouts on November 8, 2012, appellant stated he was driving his van that evening and that, after working out at a fitness center in Worthington, he went to the home of one of his personal training clients located in Hilliard. Appellant was inconsistent in describing when he arrived at his client's home; at various times he referred to his arrival time as around 8:30 p.m. or as sometime after 9:00 p.m. He stated that he remained at the client's home until around 10:00 or 10:30 p.m. Appellant further stated that after leaving his client's home, he ran out of gas near Interstates 270 and 71 and his wife had to bring him a gas can so that he could refill the vehicle. When asked how his van's license plate could have been detected on a license plate reader from a Westerville police department cruiser on Cleveland Avenue, near the area of St. Ann's Hospital at 9:07 p.m., appellant reiterated that he traveled from Worthington to Hilliard and then returned home.

### E. Jury Verdicts and Sentencing

{¶ 26} At the close of trial, appellant's counsel moved to dismiss all charges under Crim.R. 29. The trial court granted appellant's motion with respect to Count 6 in case No. 12CR-5963, because the victim named in that kidnapping count was not specifically identified by the employee who testified about the November 8, 2012 Wendy's robbery. The jury found appellant guilty of all remaining charges: 4 counts of robbery and 5 counts of kidnapping in case No. 12CR-5963, and 26 counts of robbery and 1 count of kidnapping in case No. 13CR-4174. On October 29, 2014, the trial court conducted a sentencing hearing. On October 31, 2014, the trial court issued judgment entries in both cases, concluding that certain charges merged for purposes of sentencing and that certain portions of the sentence were to be served consecutively with each other, for a total sentence of 42 years imprisonment.

## II. ASSIGNMENTS OF ERROR

{¶ 27} Appellant appeals from the trial court's judgments, assigning six errors for this court's review in a brief filed by counsel:

> [I.] THE DEFENDANT WAS DEPRIVED OF HIS RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW WHEN POLICE OFFICERS WERE ALLOWED TO INDICATE THEIR BELIEFS THAT THE IMAGES OF THE SUSPECT OR SUSPECTS IN THE OTHER ROBBERIES WERE THAT OF

THE DEFENDANT AND THAT THEY WERE CERTAIN THAT ALL THE OFFENSES WERE COMMITTED BY THE SAME DEFENDANT AND BY THE INTRODUCTION OF INADMISSIBLE COMMUNITY AND VICTIM IMPACT EVIDENCE.

[II.] THE TRIAL COURT ERRED WHEN IT JOINED THE TWO INDICTMENTS FOR TRIAL WHEN THE JOINDER WAS EXTREMELY PREJUDICIAL TO THE DEFENDANT AND THE STATE WAS UNABLE TO ESTABLISH THAT THE EVIDENCE OF THE ONE OFFENSE WOULD HAVE BEEN ADMISSIBLE TO SHOW A MODUS OPERANDI INDICATIVE OF A BEHAVIORAL FINGERPRINT OR UNIQUE, SIGNATURE-LIKE MANNER OF COMMITTING THE OTHER OFFENSES.

[III.] THE TRIAL COURT ERRED WHEN IT INSTRUCTED THE JURY, OVER THE DEFENDANT'S OBJECTION, THAT THEY COULD CONSIDER THE ACTS OF THE DEFENDANT IN ONE INSTANCE TO PROVE IDENTITY IN THE OTHER INCIDENTS.

[IV.] THE DEFENDANT DID NOT RECEIVE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE I, OF THE OHIO CONSTITUTION WHEN COUNSEL FAILED TO OBJECT TO IMPROPER POLICE OFFICER OPINIONS OF THE DEFENDANT'S GUILT, PREJUDICIAL AND IRRELEVANT VICTIM IMPACT EVIDENCE, AND FAILED TO HAVE A RECORD MADE OF THE JOIN[D]ER HEARING.

[V.] THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN THE CONVICTIONS.

[VI.] THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 28} Appellant also submitted a pro se supplemental brief, assigning five additional errors for this court's review:

[VII.] The Trial Court erred by not addressing the first search warrant and allowing testimony of information not within the four corners of the affidavit nor made part of the record during issuance to rehabilitate the lack of veracity and *basis of knowledge* upon which the affiant based his subjective *beliefs*, which do not support probable cause nor a good faith reliance. The Trial court abused its discretion giving weight to the extraneous testimony and counsel was ineffective under *Strickland for* not objecting to such testimony.

[VIII.] The Trial Court erred by refusing to acknowledge and address that detective Todd Cress knowingly, and intentionally, with reckless disregard for the truth, *did not* inform the second judge, nor referenced his intent to reuse and incorporate the *uncorroborated* information from the fruitless January affidavit with appropriate words of incorporation, *at all*. Knowing *uncorroborated* information *does not* support probable cause. Thus, it cannot legally be part of the November 9th, 2012 affidavit and must be excised.

[IX.] The Trial Court erred by not finding that the misleading "new indicia" provided by witness Troy Huff was *falsified* by detective Todd Cress in *bad faith* having the signed hand written statements in possession. The trial court[']s application of the good faith exception under these circumstances, resulted as in 28 USCS § 2254, "a decision that was contrary to, or involved an unreasonable application of, clearly established law, as determined by the United States, and a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding," permitting a false statement to justify it.

[X.] The January affidavit, illegally incorporated under false pretenses, without informing the judge, and the misleading and falsified statement of Troy Huff, should then be excised or set aside. With the affidavit's material set to one side, the affidavit's remaining content is *insufficient* to establish probable cause for the warrant to issue, and the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit. *State v. Hunt*, 22 Ohio App.3d 43, at 903, citing *Franks v. Delaware*.

[XI.] Counsel was Ineffective Assistance in violation of the Sixth Amendment to the United States Constitution and

Section 10, Article I of the Ohio Constitution for failing to raise the following Fourth Amendment violations.

(Sic passim.)

## III.  DISCUSSION

### A. Denial of Appellant's Motion to Suppress

{¶ 29} We begin with appellant's five supplemental assignments of error set forth in his pro se supplemental brief, which we will refer to as the seventh through eleventh assignments of error.  These alleged errors relate to the trial court's denial of appellant's motion to suppress evidence obtained pursuant to the November 2012 GPS tracking warrant and to allegations of ineffective assistance of counsel related to that warrant.

{¶ 30} Prior to trial, appellant moved to suppress the evidence obtained pursuant to the November 2012 GPS tracking warrant, asserting that the affidavit submitted by Detective Cress in support of that warrant ("Cress affidavit") did not demonstrate probable cause.  The state filed a memorandum in opposition to the motion to suppress, asserting that the information in the Cress affidavit established probable cause to support the warrant.  In the alternative, the state asserted that even if the Cress affidavit was insufficient, the evidence obtained pursuant to the warrant would be admissible under the good-faith exception to the exclusionary rule.  The trial court denied appellant's motion to suppress, concluding that the judge issuing the November 2012 GPS tracking warrant had a substantial basis for concluding that probable cause existed and that, in the alternative, the good-faith exception to the exclusionary rule would have applied.

{¶ 31} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. *See also State v. Belton*, __ Ohio St.3d __, 2016-Ohio-1581, ¶ 100, citing *Burnside*.  In evaluating the motion to suppress, the trial court acts as the finder of fact and, therefore, is in the best position to resolve factual questions and evaluate the credibility of witnesses. *Burnside* at ¶ 8.  Therefore, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Id*.  "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.  See also State v. Johnson*,

10th Dist. No. 13AP-637, 2014-Ohio-671, ¶ 6 ("We apply a de novo standard in determining whether the trial court properly denied appellant's motion to suppress.").

{¶ 32} In his seventh assignment of error, appellant appears to assert the trial court erred by relying on testimony presented at the suppression hearing, which was beyond the face of the Cress affidavit, in determining that the judge issuing the warrant had a substantial basis for concluding that probable cause existed. Appellant argues that the Cress affidavit failed to demonstrate the veracity and basis of knowledge to support the assertions contained therein; he claims that the trial court improperly relied on extraneous testimony from the suppression hearing to rehabilitate the allegedly insufficient affidavit.

{¶ 33} The Fourth Amendment to the United States Constitution, applied to the states through the Fourteenth Amendment, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or other things to be seized." The Ohio Constitution contains a nearly identical provision. Ohio Constitution, Article I, Section 14. *See also* R.C. 2933.22(A); Crim.R. 41(C).

{¶ 34} When determining whether a search warrant affidavit demonstrates probable cause, a magistrate must " 'make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *State v. George*, 45 Ohio St.3d 325 (1989), paragraph one of the syllabus, quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). An appellate court reviewing the sufficiency of probable cause contained in an affidavit must not substitute its judgment for that of the magistrate but, rather, ensure that the magistrate "had a substantial basis for concluding that probable cause existed." *Id.* at paragraph two of the syllabus. This analysis is undertaken with great deference to the magistrate's determination of probable cause, and marginal cases should be resolved in favor of upholding the warrant. *Id.* The Supreme Court of Ohio has held that "when no oral testimony is presented to the neutral and

detached magistrate in conjunction with an affidavit for a search warrant, the probable-cause determination is based on the four corners of the document." *State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, ¶ 106.

{¶ 35} The trial court denied appellant's motion to suppress because it concluded that, given the totality of the circumstances, the Cress affidavit contained information providing the issuing magistrate with a substantial basis for concluding that probable cause for the warrant existed. However, despite appellant's contention in the seventh assignment of error, the trial court does not appear to rely on testimony beyond the face of the Cress affidavit to reach this conclusion. Instead, the trial court expressly referred to the information contained in the Cress affidavit and concluded that this information provided a substantial basis for the issuing magistrate to find probable cause to support the warrant. The trial court did refer to testimony from the suppression hearing, but this reference was in the context of addressing appellant's claim that the Cress affidavit contained material misrepresentations of fact that were presented in bad faith or in reckless disregard for the truth. In the motion to suppress, appellant argued that Detective Cress misrepresented the witnesses' descriptions of the robbery suspect, citing aspects of various witness statements that were not set forth in the affidavit. The trial court concluded that, based on the suppression hearing testimony, Detective Cress had a good-faith belief that he was presenting the facts in an accurate manner to the issuing magistrate. The court noted that, despite some variance in the witnesses' descriptions of the robbery suspect and the vehicle used in the robberies, there was a general theme to the descriptions and concluded that the Cress affidavit accurately set forth this information. Under these circumstances, we cannot conclude that the trial court improperly relied on testimony outside the four corners of the affidavit in determining that the magistrate had a substantial basis for finding probable cause.

{¶ 36} Accordingly, we overrule appellant's seventh assignment of error.

{¶ 37} Appellant's eighth assignment of error asserts the trial court erred by denying the motion to suppress because the affidavit in support of the November 2012 GPS tracking warrant incorporated information from the affidavit presented in support of the January 2012 GPS tracking warrant without advising the magistrate that such material was being incorporated or that the January 2012 GPS tracking warrant had not

resulted in evidence of criminal activity. This assignment of error appears to raise two arguments and we will address each in turn.

{¶ 38} Appellant first argues that the Cress affidavit improperly incorporated the affidavit submitted by Detective Franken in support of the January 2012 GPS tracking warrant ("Franken affidavit") without advising the magistrate that the prior warrant was being incorporated. Appellant cites *State v. Hardy*, 2d Dist. No. 19029, 2002-Ohio-2371, as setting forth the standard for when a search warrant affidavit may incorporate a previous affidavit. In *Hardy*, a police detective obtained a search warrant by written affidavit for a particular address that he believed to be the defendant's residence. *Id.* at ¶ 2. After attempting to execute the search warrant, the detective went to the defendant's workplace; she was not present, but her employer advised the detective that he had a different residential address for the defendant. The detective then created a one-paragraph addendum to the affidavit in support of the search warrant setting forth the new address. He presented it to the same judge who had executed the prior warrant, and the judge approved the addendum. *Id.* at ¶ 3. The detective located the defendant at the second address and presented her with the search warrant; she spoke with the detective and told him where the documents he sought were located, and accompanied him to the first address where a search revealed items obtained by fraudulently obtained credit. *Id.* The defendant subsequently filed a motion to suppress, which the trial court denied. *Id.* at ¶ 4.

{¶ 39} The Second District Court of Appeals held that "[a]n addendum used when seeking a warrant may incorporate a previous affidavit, but it must do so by referencing the previous affidavit, being attached to the previous affidavit and swearing to the affidavit a second time before the same judge who issued the first warrant." *Id.* at ¶ 9, citing *State v. Owens*, 51 Ohio App.2d 132, 148 (9th Dist.1975). The court further held that "an addendum can be part of an affidavit for a search warrant if the two are presented contemporaneously to the issuing judge and the judge administers the oath with the understanding of the police officer and the judge that the oath applies to both the affidavit and the addendum." *Id.*, citing *State v. Thurman*, 2d Dist. No. 12420 (July 2, 1991). The court found that it was unclear from the record whether the addendum was attached to the previous affidavit and search warrant when presented to the issuing judge and

whether the detective took an oath as to the veracity of the addendum's statements; accordingly, the court of appeals remanded to the trial court for further proceedings.

{¶ 40} Here, appellant argues that the Cress affidavit incorporated the Franken affidavit as an addendum without an oath that applied to both the affidavit and the addendum. However, after reviewing both affidavits and the transcript of the hearing on appellant's motion to suppress, we find this case to be distinguishable from *Hardy*. In this case, the Cress affidavit set forth the same information that had been contained in the Franken affidavit with respect to the series of robberies committed in 2011 and the results of the joint investigation into those robberies. However, Detective Cress did not incorporate this information through a reference to the Franken affidavit or attempt to use the Franken affidavit as an addendum to his own. Instead, Detective Cress set forth this information as part of his own affidavit, presenting the magistrate with information regarding the 2011 robberies and joint investigation, as well as additional information regarding the November 8, 2012 robbery and subsequent additional investigation. Thus, this is not a case involving an addendum incorporated by reference and a factual question as to whether the addendum was presented to the judge at the time the warrant was issued.

{¶ 41} Appellant further appears to argue that the Cress affidavit was improper because it did not inform the magistrate about the January 2012 GPS tracking warrant and that no evidence of criminal activity was obtained as a result of that warrant. "To successfully attack the veracity of a facially sufficient search warrant affidavit, a defendant must show by a preponderance of the evidence that the affiant made a false statement, either 'intentionally, or with reckless disregard for the truth.' " *State v. Waddy*, 63 Ohio St.3d 424, 441 (1992), quoting *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). "Omissions count as false statements if 'designed to mislead, or * * * made in reckless disregard of whether they would mislead, the magistrate.' " (Emphasis omitted.) *Id.*, quoting *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir.1990). *See also State v. Dibble*, 133 Ohio St.3d 451, 2012-Ohio-4630, ¶ 18, citing *Waddy*. Thus, appellant must demonstrate that Detective Cress intended to mislead the magistrate by omitting the information about the January 2012 GPS tracking warrant or acted with reckless disregard as to whether omitting such information would mislead the magistrate.

{¶ 42} The Second District Court of Appeals considered a similar argument in *State v. Stropkaj*, 2d Dist. No. 18712 (Nov. 16, 2001). In *Stropkaj*, the defendant, who operated an escort service, was charged with promoting prostitution. She filed a motion to suppress certain evidence obtained pursuant to three search warrants, arguing that there were material misleading omissions in the common affidavit in support of the search warrants. The trial court denied the defendant's motion to suppress and a subsequent motion to reconsider and for findings of fact and conclusions of law. The defendant subsequently pled no contest and appealed from her conviction and sentence. On appeal, the Second District ultimately reversed and remanded, finding that there were material omissions from the search warrant affidavits and that the trial court erred by failing to make a determination as to whether those omissions were made intentionally or with reckless disregard as to whether the omissions would tend to mislead a magistrate. However, the court concluded that certain alleged omissions, which are similar to the alleged omission in this case, were not misleading. *Id.*

{¶ 43} The defendant in *Stropkaj* asserted that the affidavit in support of the search warrants was misleading because it failed to inform the magistrate that (1) there were no criminal charges or arrests following a search of the escort service in 1993, (2) there were no complaints or investigations of the defendant between 1993 and 1998, and (3) two earlier search warrants (issued in 1993 and 1997) produced no evidence. The Second District found that the affiant's failure to aver the absence of additional incriminating facts was not misleading. The court concluded that in order for an omitted fact to be intentionally misleading or made with reckless disregard of its tendency to mislead the magistrate, the fact would necessarily have to be exculpatory information or information that impeaches a source of incriminating information. The court reasoned that a magistrate would naturally assume that any incriminating evidence would be set forth in the affidavit and there would be no useful purpose in requiring the affiant to include a paragraph asserting that he was not aware of any incriminating facts beyond those set forth in the affidavit. Thus, the court rejected the defendant's argument that the affidavit was misleading because it failed to inform the magistrate of the lack of certain incriminating evidence, including the fact that two prior search warrants produced no evidence. *Id.*

{¶ 44} In this case, the Cress affidavit did not inform the magistrate that the January 2012 GPS tracking warrant had been issued and that GPS units were placed on appellant's vehicle between January 27 and April 25, 2012, and on appellant's wife's vehicle between January 27 and April 24, 2012 pursuant to that warrant. The Cress affidavit also did not state that no evidence was obtained pursuant to that warrant. However, the Cress affidavit stated that following the PNC Bank robbery on November 10, 2011, the series of robberies stopped and no further evidence was obtained against appellant. Thus, although the Cress affidavit did not expressly notify the magistrate that a prior GPS tracking warrant had been issued, it did advise the magistrate that no additional evidence had been obtained against appellant during the nearly one-year period between the November 10, 2011 PNC Bank robbery and the November 8, 2012 Wendy's robbery. Detective Franken testified at the suppression hearing that there were no robberies attributed to the "counter jumper" during the period when the GPS tracking devices were attached to appellant's vehicles pursuant to the January 2012 GPS tracking warrant. The lack of incriminating evidence from the January 2012 GPS tracking warrant during a period when there appeared to have been no activity by the "counter jumper" robber is not, in an of itself, exculpatory information. Under these circumstances, we find that Detective Cress's omission of the fact that the January 2012 GPS tracking warrant had been issued and that tracking had been completed without obtaining additional evidence was not designed to mislead or made in reckless disregard of whether it would mislead the magistrate. *See Waddy* at 441.

{¶ 45} Accordingly, we overrule appellant's eighth assignment of error.

{¶ 46} Appellant's ninth assignment of error asserts the trial court erred by not finding that the Cress affidavit contained an intentionally misleading false statement. As explained above, a defendant challenging a facially sufficient search warrant affidavit must demonstrate by a preponderance of the evidence that the affiant made a false statement intentionally or with reckless disregard for the truth. *Id.* Appellant argues that Detective Cress made a false statement with respect to a witness's statement following the November 8, 2012 Wendy's robbery. In his affidavit, Detective Cress stated that a witness observed the robbery suspect fleeing in a "dark colored minivan." (Cress Aff. at 8.) However, the witness's handwritten statement, which was introduced into evidence at the

suppression hearing indicated that the van was a mid-1990s Astro van and was a shade of red. Additionally, an informational summary completed by another detective who interviewed the witness stated that the witness described the van as a red or maroon mid-to-late 1990s Astro van. There was also a preliminary investigation report prepared by one of the first patrol officers to arrive at the robbery scene, which indicated that the witness described the van as a maroon, rusty green, or dark-colored "Astro-like" van.

{¶ 47} Appellant asserts that Detective Cress intentionally omitted the witness's description of the van as red, maroon, or rusty green and as being similar to an Astro van so that the description of the van in the affidavit would be more consistent with appellant's vehicle, which was a blue Ford Aerostar minivan. Detective Cress testified at the suppression hearing with respect to the process of preparing his affidavit in support of the search warrant, which was obtained at 1:13 a.m. on November 9, 2012, approximately four hours after the November 8, 2012 Wendy's robbery. Detective Cress testified that after arriving at the scene of the robbery, he spoke with one of the patrol officers on the scene, who told him that the witness had given a statement regarding a dark-colored minivan. Detective Cress further testified that after obtaining the November 2012 GPS tracking warrant, he received the witness statement summaries from another detective and read the witness's handwritten statement describing the van as red. He indicated that he did not attempt to revise the affidavit after learning this information because he considered red to be a dark color, especially at night.

{¶ 48} Appellant has not shown by a preponderance of the evidence that Detective Cress made an intentional false statement in his affidavit or made a statement with reckless disregard for the truth. The affidavit was prepared during a brief period following the November 8, 2012 Wendy's robbery. Detective Cress testified at the suppression hearing regarding the basis of his assertion that the vehicle in question was dark colored. His testimony that one of the patrol officers on the scene advised him that the witness indicated the vehicle was a dark color is supported by the preliminary investigation report, which indicated that the witness described the vehicle as maroon, rusty green, or *dark colored*. Under these circumstances, we conclude the trial court did not err by denying the motion to suppress based on appellant's claim of an intentional false statement.

{¶ 49} Accordingly, we overrule appellant's ninth assignment of error.

{¶ 50} In his tenth assignment of error, appellant asserts that, after setting aside the portions of the Cress affidavit that he alleges were improperly incorporated from the earlier Franken affidavit and characterizing the witness's statement regarding the van used by the individual fleeing the November 8, 2012 Wendy's robbery, the remainder of the affidavit was insufficient to establish probable cause to support the warrant. However, for the reasons explained above, we conclude that the portions of the Cress affidavit describing the robbery events that occurred in 2011 and the joint investigation of those events did not constitute improper incorporation of the Franken affidavit. Likewise, we conclude that appellant failed to establish that the portion of the Cress affidavit characterizing the witness's statement was an intentional false statement or made with reckless disregard as to the truth. Therefore, we reject the basis for the tenth assignment of error and need not determine whether the remaining portions of the Cress affidavit would have been sufficient to establish probable cause.

{¶ 51} Accordingly, we overrule appellant's tenth assignment of error.

{¶ 52} Appellant's eleventh assignment of error asserts that his counsel provided ineffective assistance in various respects with regard to the November 2012 GPS tracking warrant. Appellant claims that his counsel was ineffective by failing to raise various alleged Fourth Amendment violations in support of the motion to suppress; we will consider each claim separately.

{¶ 53} Courts apply a two-part test to evaluate claims of ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-42 (1989). "First, the defendant must show that counsel's performance was deficient." *Strickland* at 687. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* This court has recognized that the failure to file a motion to suppress may constitute ineffective assistance of counsel when the record demonstrates that the motion would have been granted. *State v. Hawkins*, 10th Dist. No. 15AP-35, 2016-Ohio-1404, ¶ 93. Based on this principle, the failure to raise a particular argument in support of a motion to suppress may constitute ineffective assistance when the record demonstrates that the motion would have been granted had that argument

been asserted.  "Counsel is not deficient for failing to raise a meritless issue."  *State v. Massey*, 10th Dist. No. 12AP-649, 2013-Ohio-1521, ¶ 13.

{¶ 54} Appellant first argues that his counsel was ineffective by failing to object to extraneous testimony and evidence beyond the four corners of the Cress affidavit, as described in the seventh assignment of error.  However, as explained above, we conclude that the trial court did not rely on this testimony in concluding that the Cress affidavit established probable cause for the warrant.  Therefore, even if appellant could establish that his counsel performed deficiently, he cannot establish that he was prejudiced by the failure to object by demonstrating that the trial court would have granted the motion to suppress had the testimony been excluded.

{¶ 55} Appellant next argues that his counsel was ineffective by failing to argue that granting a GPS tracking warrant for 90 days constituted a fundamental violation of Crim.R. 41(C)(2) and required automatic suppression of the evidence obtained pursuant to the warrant.  Appellant cites the provision of Crim.R. 41(C)(2) stating that the time an electronic tracking device may be used may not exceed 45 days.  However, as the state notes, the portion of Crim.R. 41(C)(2) limiting the use of a tracking device to 45 days was enacted effective July 1, 2014, and, therefore, was not part of the rule at the time the November 2012 GPS tracking warrant was issued.  Accordingly, granting a 90-day tracking warrant was not a per se constitutional violation.  Appellant has failed to demonstrate that his counsel was deficient for failing to raise this issue or that the motion would have been granted had the issue been asserted in the motion to suppress.

{¶ 56} Appellant further asserts that his counsel was ineffective by failing to argue that the information contained in the Cress affidavit was stale because it had been included in the prior Franken affidavit in support of the January 2012 GPS tracking warrant, and that warrant had not resulted in evidence of criminal activity by appellant. "An affidavit in support of a search warrant must present timely information and include facts so closely related to the time of issuing the warrant as to justify a finding of probable cause at that time."  *State v. Ingold*, 10th Dist. No. 07AP-648, 2008-Ohio-2303, ¶ 22. However, "[t]here is no arbitrary time limit that dictates when information becomes stale."  *Id.* Moreover, this court has recognized that " '[w]here recent information corroborates otherwise stale information, probable cause may be found.' "  *Id.* at ¶ 35,

quoting *United States v. Spikes*, 158 F.3d 913 (6th Cir.1998). In this case, the Cress affidavit provided additional information arising from the November 8, 2012 Wendy's robbery, indicating that the suspect in that incident wore similar attire and used similar methods to the suspect in the 2011 robberies. The Cress affidavit also indicated that, shortly after the robbery, appellant's minivan had registered on a license plate reader mounted to a police cruiser that was in the area near the robbery. Assuming, without deciding, that the information regarding the series of robberies in 2011 was stale, this additional information may have served to corroborate the information about the earlier robberies. Under these circumstances, we conclude that appellant has failed to demonstrate that his counsel was deficient for failing to raise this issue or that the motion would have been granted had the issue been asserted in the motion to suppress.

{¶ 57} Finally, appellant argues that his counsel was ineffective for failing to argue that the warrant was unconstitutionally overbroad because it did not sufficiently describe the evidence to be obtained pursuant to the warrant. The November 2012 GPS tracking warrant provided that officers were authorized to install and use the tracking device to obtain evidence of the commission of the criminal offense of aggravated robbery. Appellant appears to argue that authorities may not use GPS tracking in an effort to catch a suspect in the act of committing a criminal offense, citing several cases including *United States v. Katzin*, E.D.Pa. No. 11-226 (May 9, 2012), *State v. Sullivan*, 10th Dist. No. 13AP-173, 2014-Ohio-1443, *State v. White*, 5th Dist. No. 13-CA-11, 2013-Ohio-5221, *United States v. Ford*, E.D.Tenn. No. 1:11-cr-42 (Sept. 12, 2012), and *United States v. Lee*, 862 F.Supp.2d 560 (E.D.Ky. 2012). However, each of those courts was addressing a scenario involving *warrantless* GPS tracking, not the question of whether a warrant sufficiently described the evidence to be obtained from the use of a GPS tracking device. Given the failure to clearly define or provide authority in support of this proposition, we cannot conclude that his counsel was ineffective for failing to raise it in support of the motion to suppress.

{¶ 58} Accordingly, we overrule appellant's eleventh assignment of error.

### B. Joinder of Indictments

{¶ 59} Having addressed the assignments of error related to the motion to suppress, we now turn to appellant's second assignment of error, in which he asserts that

the trial court erred by joining the two indictments for trial. Appellant asserts that joinder of the indictments was prejudicial to appellant and that the state was unable to rebut the prejudice by showing that evidence of the offenses under one indictment would have been admissible at a separate trial on the other indictment.[1] Although appellant was not present to object to joinder, he did file a motion to sever the indictments.

{¶ 60} Pursuant to Crim.R. 13, a trial court may order two or more indictments to be tried together "if the offenses or the defendants could have been joined in a single indictment or information." Crim.R. 8(A) provides that two or more offenses may be charged in the same indictment if they "are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." "The law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged 'are of the same or similar character.' " *State v. Lott*, 51 Ohio St.3d 160, 163 (1990), quoting *State v. Torres*, 66 Ohio St.2d 340, 343 (1981), fn. 2.

{¶ 61} If similar offenses are properly joined, a defendant may move to sever the charges pursuant to Crim.R. 14(A): "If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment, information, or

---

[1] We note that the portion of appellant's brief addressing the second assignment of error asserts that the trial court committed certain procedural errors with respect to the motion for joinder. Specifically, appellant's brief asserts that the trial court conducted an off-the-record hearing on the motion for joinder and that appellant was not notified and not present for the hearing. Appellant argues that the failure to have the hearing on the record violated Crim.R. 22, and that the failure to have appellant present violated Crim.R. 43. As the state notes, however, appellant failed to expressly assign these arguments as errors for the court's review. Appellant's second assignment of error, as set forth above, asserts that the trial court erred by granting the motion for joinder because the joinder was prejudicial to appellant and the state was unable to establish that evidence of the offense where appellant was apprehended would have been admissible as other act evidence.

We have previously held that pursuant to App.R. 12(A)(1)(b) " 'this court rules on assignments of error only, and will not address mere arguments.' " *State v. McKinney*, 10th Dist. No. 13AP-211, 2013-Ohio-5394, ¶ 11, quoting *Ellinger v. Ho*, 10th Dist. No. 08AP-1079, 2010-Ohio-553, ¶ 70. *See also Bonn v. Bonn*, 10th Dist. No. 12AP-1047, 2013-Ohio-2313, ¶ 9 ("[W]e will address each assignment of error as written and disregard any superfluous arguments not raised by the actual assignment of error under review."); *In re Estate of Taris*, 10th Dist. No. 04AP-1264, 2005-Ohio-1516, ¶ 5 ("Pursuant to App.R. 12(A)(1)(b), this court is required to determine the appeal based upon the assignments of error set forth in the briefs under App.R. 16. This is procedurally necessary, as we are permitted to sustain or overrule only assignments of error and not mere arguments."). Accordingly, because appellant did not assign as error any alleged procedural deficiencies relating to the hearing on the motion for joinder, we will limit our review to his argument that the trial court committed substantive error by granting the motion for joinder.

complaint, or by such joinder for trial together of indictments, informations or complaints, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires." To demonstrate that a trial court erred by denying a motion to sever, a defendant "must affirmatively demonstrate (1) that his rights were prejudiced, (2) that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial." *State v. Schaim*, 65 Ohio St.3d 51, 59 (1992), citing *Torres* at syllabus.

{¶ 62} We note that appellant's motion to sever provided, at best, minimal support for his claim of prejudice. The memorandum in support of that motion is scarcely more than one page long, and with respect to the issue of prejudice, simply asserts that appellant would be prejudiced by joining the 2011 offenses together with the November 2012 offenses. This unsupported assertion may well fall short of establishing that his rights were prejudiced or providing the "trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to fair trial." *Schaim* at 59. *See also State v. Massey*, 10th Dist. No. 99AP-1355 (Nov. 28, 2000) ("Defendant has not pointed to any evidence of actual prejudice, and may not prevail by presuming prejudice based on the number of counts. Defendant has failed to suggest how he likely would have been acquitted on some counts had the four incidents been tried separately, and thus has not satisfied the first prong of *Torres*."). Appellant's counsel indicated to the trial court immediately before trial that the brief motion was effectively intended to preserve the issue for appellate review. Despite the minimal support contained in the motion to sever, however, we will consider the question of whether the state could rebut any showing of prejudice.

{¶ 63} Even if a defendant establishes that the joinder was prejudicial, the state may rebut the showing of prejudice in two ways. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶ 50. First, the state may demonstrate that evidence of the joined offenses would be admissible as "other acts" evidence under Evid.R. 404(B) in separate trials. *Id.* Second, the state may demonstrate that evidence of the joined offenses is simple and direct. *Id.* These tests are disjunctive; satisfying one test negates a

defendant's claim of prejudice without having to consider the other test. *State v. Wilson*, 10th Dist. No. 10AP-251, 2011-Ohio-430, ¶ 15.

{¶ 64} Evid.R. 404(B) provides, in relevant part, that evidence of other crimes or acts is not admissible to prove the character of a person in order to show action in conformity with such character. Such evidence may, however, be "admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). In this case, the state argues that the evidence related to the charges in each indictment would have been admissible at separate trials under Evid.R. 404(B) to prove identity by establishing a modus operandi. "To be admissible to prove identity through a certain modus operandi, other acts evidence must be related to and share common features with the crime in question." *State v. Lowe*, 69 Ohio St.3d 527 (1994), paragraph one of the syllabus.

{¶ 65} The Supreme Court of Ohio and this court have held that evidence of multiple robberies may be admissible as other acts evidence where there are sufficient common features to establish a modus operandi. In *State v. Jamison*, 49 Ohio St.3d 182 (1990), the Supreme Court found that evidence of seven other robberies was admissible in a trial for aggravated murder and aggravated robbery to prove identity. The court concluded that the evidence regarding the seven other robberies established a pattern: each of the robberies occurred during a six-month period; each establishment robbed was located in the downtown area of Cincinnati; all but one of the robberies occurred on weekday afternoons; all of the establishments were first-floor, walk-in businesses; the defendant physically took or attempted to take money from the register except for the one business that had no register; and the defendant forced, threw, or knocked victims to the floor and consistently directed violence toward his victims' heads. *Id.* at 186. Because the characteristics of this pattern were consistent with the incident giving rise to the aggravated murder and aggravated robbery charges, evidence related to the other robberies was admissible to prove that the defendant committed the aggravated murder and aggravated robbery. *Id.* ("These other acts, i.e., robberies, do not simply prove appellant's character; more importantly, they are probative to ascertain appellant's identity as the Central Bar killer.").

{¶ 66} This court has similarly ruled that joinder of multiple robbery charges is not improper where evidence of the robberies would be admissible in separate trials under Evid.R. 404(B). *Wilson* at ¶ 21; *State v. Sealy*, 10th Dist. No. 09AP-1128, 2010-Ohio-6294, ¶ 19. In *Wilson*, the court described the similarity of the relevant crimes:

> The crimes here all occurred during business hours and all involved restaurants in the south-side area of Columbus so as to be geographically linked. All four robberies involved a black man with missing teeth that approached the register and demanded money from it. In three of the four robberies the evidence established the perpetrator placed a food order prior to demanding money, and in fact, the same item, i.e., pepper steak, was ordered in each of the robberies at Hunan King. Also, in three of the four robberies, the evidence established the perpetrator showed a gun while making his demands. Both the Pizza Hut and the KFC robberies involved the use of a note and the presence of a plastic bag, and both Hunan King robberies involved the person counting to ten while waiting for the money. Moreover, appellant was identified by witnesses from three of the four robberies.

*Id.* at ¶ 20. The court noted that although the crimes differed from one another in some respects, "admissibility under Evid.R. 404(B) is not adversely affected simply because the other [crimes] differed in some details." (Internal citations omitted.) *Id.* at ¶ 21. Similarly, in *Sealy*, the court found that the state had rebutted the defendant's claims of prejudicial joinder:

> Here, the record contains evidence of five aggravated robberies and related offenses that occurred over a five-month period. The crimes are geographically linked as they all occurred within less than a two-mile radius of appellant's residence. In each crime, appellant was described as wearing dark clothing, entering a business brandishing a handgun, and demanding money from the cash register. In three of the robberies, appellant was described as firing the gun. Appellant's car was placed at three of the robberies, and he was positively identified by witnesses from four of the robberies. Clearly, the evidence here establishes the robberies followed a similar pattern and were geographically linked such that evidence of one could have been introduced by the state in a trial of each of the others under Evid.R. 404(B) to establish appellant's identity through his modus operandi.

> Thus, appellant was not prejudiced by the joinder of the offenses for trial.

*Sealy* at ¶ 19.

{¶ 67} In this case, the 2011 robberies shared many similar characteristics: the suspect was an African-American male, wearing dark clothing, including a mask, and dark gloves with white markings or letters on the gloves. The suspect brandished a small handgun, which he held in his left hand. The suspect had employees open cash registers and reached into the cash registers with his right hand to take the contents. In all but the first robbery, the suspect either jumped over or walked behind the counter, thereby entering an area where the public would not normally be present. In all but one of the robberies, the suspect ordered the employees to get on the ground. Ten of the 13 robberies in 2011 occurred at night. Eight of the 13 robberies occurred at restaurants, mostly Subway or Tim Horton establishments, and another 3 robberies occurred at gas stations. Nine of the robberies occurred in the northern part of Franklin County.

{¶ 68} Many of the distinguishing characteristics from the 2011 robberies were also present in the 2012 robberies that were charged in case No. 12CR-5963. In the November 8, 2012 Wendy's robbery, the suspect was an African-American male who wore dark clothing, including a mask, and dark gloves with white markings or letters. The robbery occurred at night, and the suspect, who held a small handgun in his left hand, went behind the counter and reached into the cash register after ordering the employees to open it. He also ordered the employees to get on the floor. The robbery occurred in the northern part of Franklin County. Similarly, in the November 15, 2012 BMV office robbery, appellant, an African-American male, wore dark clothing, including a mask, and dark gloves with white markings or letters. He brandished a small handgun in his left hand. The robbery occurred just after 6:30 p.m., as the BMV office was closing for the day. In committing the robbery, appellant went behind the counter into an area where the public would not normally be present. The BMV office was located in the northern part of Franklin County. Under these circumstances, we find that the 2012 robberies followed a similar pattern and shared numerous characteristics with the series of robberies committed in 2011. Therefore, the evidence of the 2011 robberies could have

been introduced by the state in a trial of the 2012 robberies under Evid.R. 404(B), and vice versa. Appellant was not prejudiced by the joinder of these offenses for trial.

{¶ 69} Accordingly, we overrule appellant's second assignment of error.

### C. Opinion and Victim Impact Testimony

{¶ 70} Appellant argues in his first assignment of error that he was deprived of due process and his right to a fair trial when the trial court admitted opinion testimony from police officers and victim impact testimony. Appellant asserts that police officers were improperly allowed to testify at trial as to their opinions regarding appellant's guilt; he further asserts that portions of an interrogation video that was played for the jury contained improper opinion and hearsay statements from the interrogating police officers. Appellant also argues that the trial court erred by admitting victim impact testimony that was inflammatory and prejudicial. We will consider each of appellant's arguments in turn.

{¶ 71} Generally, "the admission of evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 62. Pursuant to Evid.R. 701, a witness who has not been qualified as an expert may testify as to opinions that are "(1) rationally based on the perception of the witness[,] and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." A trial court has broad latitude in allowing or controlling lay witness opinion testimony. We will not overturn a trial court's decision concerning such testimony absent an abuse of discretion and a demonstration that the abuse of discretion materially prejudiced the objecting party. *State v. Bond*, 10th Dist. No. 11AP-403, 2011-Ohio-6828, ¶ 14.

{¶ 72} Appellant specifically cites trial testimony from Detective Davis, Detective Franken, and Special Agent Brennaman regarding the joint investigation into the serial robberies. After explaining that he had shared information with representatives from the Columbus Division of Police, ATF, Reynoldsburg Police Department, and other agencies, Detective Davis was asked whether he reached any conclusions from his comparison of videos and surveillance photos from the various robberies. As the state notes, appellant's counsel objected to the question at trial, and the trial court sustained the objection. After

additional description of the collective efforts of the law enforcement agencies, Detective Davis testified that he observed common characteristics across the robberies, including the suspect's clothing, physical characteristics, method of operation upon entering the premises, type of weapon used, and hand the weapon was carried in. Similarly, Detective Franken testified that he investigated the series of robberies, which he believed were linked, and developed approximately one dozen suspects. Detective Franken further testified that he believed that if he could link a suspect to one of the robberies, he would have identified the culprit in all of the crimes. Special Agent Brennaman testified that he worked with Detective Franken on multiple serial robbery cases, including the investigation of the 2011 robberies.

{¶ 73} Notably, the trial testimony cited in appellant's brief did not involve the law enforcement officers offering opinions about appellant's guilt but, rather, about whether all of the robberies were committed by a single suspect. Additionally, we note that, other than the objection discussed above that was sustained by the trial court, appellant's counsel did not object to this testimony at trial. Because there was no objection, appellant waived all but plain error as to this testimony. *State v. Noor*, 10th Dist. No. 13AP-165, 2014-Ohio-3397, ¶ 56 ("[T]he record reflects that no contemporaneous objection was made either to the prosecutor's questions or to the officers' answers. We must determine, therefore, whether it was plain error to allow this testimony."). Plain error involves an obvious error or defect in the proceedings that affects a substantial right; reversal is warranted only if the outcome of the trial clearly would have been different absent the error. *Id.*

{¶ 74} To the extent Detectives Davis and Franken, and Special Agent Brennaman offered opinion testimony, it was admissible lay opinion testimony under Evid.R. 701. The cited portion of Special Agent Brennaman's testimony does not appear to contain opinion testimony—he simply testified that he was involved in an investigation in which the Columbus police believed the robberies were linked. Detective Davis's testimony was clearly based on his own perceptions because he testified that he reached his conclusions based on his review of the video and photographic evidence. Likewise, Detective Franken testified that he reviewed the surveillance videos from the robbery incidents. Testimony from both Detectives Davis and Franken was helpful to the jury's understanding of each

witness's testimony regarding the investigatory process. It also assisted the jury in determining a fact in issue, i.e., the identity of the suspect in the robberies. Therefore, admission of this testimony did not constitute plain error.

{¶ 75} Appellant asserts that the most damaging evidence was introduced through the interrogation video that was played for the jury. Appellant cites to statements from Detectives Franken and Farbacher during the interrogation asserting that they believed appellant was involved in the 2011 robberies and that they had surveillance videos and cell phone records to prove that appellant committed those crimes. Appellant argues that these statements constituted hearsay and that they were improper opinion evidence because the detectives expressed their opinions that appellant was guilty of the robberies. Prior to introduction of the interrogation video at trial, appellant's attorney indicated there was a stipulation with respect to the video and that it had been edited and redacted to remove certain content. Thus, the state argues that because the parties agreed to redact certain portions of the video, any alleged error arising from admission of the remaining portions of the video could be considered invited error. "Under the 'invited error' doctrine, a party may not take advantage of an error which he invited or induced." *State v. Griffin*, 10th Dist. No. 10AP-902, 2011-Ohio-4250, ¶ 16. "Pursuant to this doctrine, a party cannot claim that a trial court erred by accepting the party's own stipulation." *State v. McClendon*, 10th Dist. No. 11AP-354, 2011-Ohio-6235, ¶ 37.

{¶ 76} Even if admission of the interrogation video does not constitute invited error, it would be subject to review under the plain error standard because appellant's counsel did not object to introduction of the non-redacted portions of the video. With respect to appellant's hearsay argument, we conclude that the detectives' statements in the interrogation video did not constitute hearsay. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). In the context of the trial proceedings, it appears that the purpose of including the detectives' statements in the portions of the interrogation video played for the jury was to provide context for appellant's statements and admissions during the interrogation. *See, e.g., State v. Woods*, 10th Dist. No. 05AP-704 (Aug. 17, 2006) ("[T]he testimony of [Detective] Junk about Dickson's statement regarding appellant's location on the morning of the robbery and the

videotape of Junk relaying Dickson's statement to appellant during the interview, were not hearsay as they were not offered for the truth of the matter asserted. Instead, they were offered to explain the context behind why appellant first claimed to Junk that he had an alibi, but later recanted his story and offered to 'let it all out,' and tell Junk that Koonts allegedly gave him money to purchase cocaine."); *State v. Rice*, 11th Dist. No. 2009-A-0034, 2010-Ohio-1638, ¶ 23 ("The focus or purpose of playing the tape was to show Mr. Rice's voluntary confession. Thus, the statements made by the detectives were not intended to improperly interject medical 'expert testimony' as to the cause of death as Mr. Rice contends. Rather, the statements were an interrogation technique employed to elicit a response from Mr. Rice."). Moreover, assuming for purposes of analysis that the portions of the video in which the detectives expressed their opinion that appellant was involved in all the robberies would constitute impermissible opinion testimony, appellant has failed to demonstrate plain error by showing that the outcome of the trial clearly would have been different had those statements not been presented to the jury. Appellant asserts that it was the most damaging evidence against him, but there was a substantial volume of evidence presented against appellant, including his own admission to the BMV office robbery and his attempt to explain his whereabouts when the license plate reader identified his van near the location of the November 8, 2012 Wendy's robbery, as well as the testimony and evidence establishing the similarities between those robberies and the 2011 robberies.

{¶ 77} Appellant further argues that the trial court erred by admitting victim impact testimony during the guilt phase of the trial. Appellant claims that this evidence was not relevant to determining whether appellant committed the robberies and only served to invoke the jury's sympathy for the victims and make the jurors more likely to convict him. Appellant cites to several specific instances of alleged victim impact testimony. The witness regarding the August 10, 2011 Subway robbery testified that she had a two-year-old child at the time of the robbery and that, following the robbery, she stopped working for Subway because she was afraid to work alone. The witness regarding the September 13, 2011 BP robbery testified that his co-worker got down on the floor crying after the robbery and quit her job immediately after the robbery. The witness regarding the September 17, 2011 Subway robbery testified that her co-worker, who was a

new employee, was laying on the floor crying after the robbery. She testified that they both decided that Subway was not a good place to work, and that the new employee quit after the robbery. She further stated that she did not know if her former co-worker would ever get a job again. The witness to the October 10, 2011 Marathon robbery testified that both he and his co-worker were very upset following the robbery. The employee who testified about the November 8, 2012 Wendy's robbery stated that she was so frightened during the robbery that she urinated on herself. She further testified that during the robbery she tried to stay calm so the robber would not hurt one of her co-workers, who was seven months pregnant at the time. One of the employees present during the November 15, 2012 BMV office robbery testified that she was concerned for her daughter, who was a co-worker and was present during the robbery, because she was five months pregnant at the time and had lost a child the prior year. She testified that her daughter was very upset and crying after the robbery and that she asked whether her daughter wanted an ambulance to be called. The daughter also testified, stating that her first instinct during the robbery was to get down on the floor to protect her unborn child. Appellant also cites to comments by Detective Franken regarding the impact on the victims that were included in the interrogation video presented to the jury.

{¶ 78} This court has recognized that testimony as to the effect of a criminal act on the victim, the victim's family, or both, is usually not considered relevant evidence with regard to the guilt or innocence of the defendant. *State v. F.R.*, 10th Dist. No. 14AP-440, 2015-Ohio-1914, ¶ 45. Victim impact testimony creates a risk of inflaming the passions of the jury and resulting in a conviction on facts unrelated to the defendant's guilt or innocence. *Id.* However, "[e]vidence relating to the facts attendant to the offense is 'clearly admissible' during the guilt phase, even though it might be characterized as victim-impact evidence." *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, ¶ 98, citing *State v. Fautenberry*, 72 Ohio St.3d 435, 440 (1995).

{¶ 79} The *F.R.* case involved a prosecution for gross sexual imposition against an 11-year-old victim. *F.R.* at ¶ 2-3. On appeal, the defendant argued in part that the trial court erred by allowing the prosecution to elicit testimony about the psychological harm suffered by the victim and her family. *Id.* at ¶ 42. The prosecutor asked the victim's mother what impact the incident had on the family. Over objection by defense counsel,

the trial court permitted the testimony to proceed and the witness testified that there had been a lot of tears and uneasiness in the neighborhood, along with having conversations with her son about why the family was careful. *Id.* at ¶ 43. This court found that the testimony was not relevant to the defendant's guilt or innocence and that the only apparent purpose for the question was to elicit sympathy from the jury. Accordingly, the court found that the trial court erred by admitting the testimony; however, the court further concluded that the error was harmless because there was no reasonable possibility it contributed to the conviction. *Id.* at ¶ 46. The court noted that the prosecutor did not dwell on the impact of the crimes during questioning or in closing argument. *Id.* at ¶ 47. The court contrasted the facts with those present in *State v. Presley*, 10th Dist. No. 02AP-1354, 2003-Ohio-6069, where a rape victim testified that she suffered nightmares about the rape and both the victim and her mother testified that the victim attempted suicide as a result of the rape. *F.R.* at ¶ 48. The *Presley* court concluded that the trial court abused its discretion by admitting that testimony which prejudiced the defendant. *Presley* at ¶ 86. Because the *F.R.* court found that there was "no reasonable possibility that the limited victim impact testimony contributed to [the defendant's] conviction," it overruled his challenge to the victim impact testimony. *F.R.* at ¶ 48.

{¶ 80} In the present case, appellant concedes that his trial counsel did not object to the purported victim impact testimony. Therefore, we apply the plain error standard. With respect to the statements of Detective Franken contained in the interrogation video, we apply the same reasoning set forth above—i.e., the statements provided context for the interrogation and appellant's responses and they were not offered to prove the truth of the matter asserted. With respect to the trial testimony cited by appellant, it seems clear that the testimony from employees of the various businesses that were robbed was not directly relevant to appellant's guilt or innocence and there was some risk that this testimony would inflame the sympathies of the jury. The evidence appears to be more substantial than the testimony deemed to be harmless in *F.R.*, but less detailed and emotional than the improper testimony in *Presley*. Moreover, in determining whether admission of this testimony constituted plain error, the entire context of the trial must be considered. The trial lasted six days and involved testimony from 30 witnesses relating to 15 separate robberies; the printed transcript of the trial spans 6 volumes and nearly 1200 pages of

testimony and argument.  Thus, while the various statements cited in appellant's brief may appear to create a notable risk of prejudice to appellant when compiled into a single paragraph, we must consider that the jury heard them as individual comments by certain witnesses throughout the course of a six-day trial.  Absent the victim impact statement, the jurors would still have been provided with voluminous evidence including descriptions and video or photographic evidence related to each robbery, as well as appellant's statements during his interrogation.  Under these circumstances, we conclude that appellant has failed to show that the outcome of his trial clearly would have been different had the victim impact testimony not been admitted; accordingly, admission of this testimony did not constitute plain error.

{¶ 81} Finally, we note that appellant generally argues in support of his first assignment of error that the prosecution relied on the opinion testimony and victim impact testimony in its closing argument.  Appellant claims that the jury must have necessarily relied on this testimony in convicting him because the jurors deliberated for less than one hour before reaching final verdicts on all charges.  We conclude, however, the jury's relatively brief deliberation does not necessarily mean their verdicts were based on emotion.  Although there was voluminous evidence and testimony presented in this case, as discussed more fully below in response to appellant's weight and sufficiency challenges, the evidence as to each robbery was largely straightforward and direct.  The key issue for the jury was identity with respect to the 2011 robberies and the November 8, 2012 Wendy's robbery, and whether the state had established sufficient similarities between those crimes and the November 15, 2012 BMV office robbery where appellant was arrested.  It is conceivable that the jurors quickly reached a consensus on this issue by reviewing the evidence and testimony presented to them.

{¶ 82} Accordingly, we overrule appellant's first assignment of error.

### D. Jury Instructions

{¶ 83} In his third assignment of error, appellant asserts the trial court erred by instructing the jurors that they could consider other acts evidence on the issue of identity. Appellant argues that this instruction was not properly tailored to the facts of the case and allowed the jury to use evidence of the November 15, 2012 BMV office robbery, where appellant was apprehended, to prove that he committed all the other robberies.  The state

responds that the instruction at issue properly served to limit the jury's use of the other acts evidence and ensure that such evidence was not used as propensity evidence.

{¶ 84} A trial court has broad discretion in instructing the jury. *State v. Daniels*, 10th Dist. No. 13AP-969, 2014-Ohio-3697, ¶ 17. Accordingly, we review the trial court's instructions for abuse of discretion. An abuse of discretion implies that the court's attitude was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 85} The Ohio Jury Instructions provides the following instruction related to other acts evidence:

> 1. * * * Evidence was received about the commission of (crime[s]) (wrong[s]) (act[s]) other than the offense(s) with which the defendant is charged in this trial. That evidence was received only for a limited purpose. It was not received, and you may not consider it, to prove the character of the defendant in order to show that he acted in (conformity) (accordance) with that character. If you find that the evidence of other (crime[s]) (wrong[s]) (act[s]) is true and that the defendant committed (it) (them), you may consider that evidence only for the purpose of deciding whether it proves
>
> (*Use appropriate alternative[s]*)
>
> (a) the absence of (mistake) (accident),
>
> (*or*)
>
> (b) the defendant's (motive) (opportunity) (intent or purpose) (preparation) (plan) to commit the offense charged in this trial,
>
> (*or*)
>
> (c) knowledge of circumstances surrounding the offense charged in this trial,
>
> (*or*)
>
> (d) the identity of the person who committed the offense in this trial,

(*or*)

(e) (*describe other purposes*).

That evidence cannot be considered for any other purpose.

(Emphasis sic.)  Ohio Jury Instructions, CR Section 401.25.

{¶ 86} In this case, the trial court gave the jury the following instruction:

> Now, members of the jury, evidence was admitted of other acts which may have been committed by the defendant. You are to consider this evidence only on the issue of identity. If you believe that the defendant committed the other act, you may consider evidence of scheme, plan or system as you decide whether the acts alleged in the indictment, if committed, were committed by the defendant rather than some other person.
>
> Now, members of the jury, let me caution you that the evidence of the scheme, plan or system is only one of the things you are to consider in determining identity. The State of Ohio must prove identity beyond a reasonable doubt. If you find that the defendant committed the other act, you may not presume that he committed the acts charged. You may, however, consider the other act, along with all the other evidence, in deciding whether the State of Ohio has proved beyond a reasonable doubt that the defendant, rather than some other person, committed the offense charged.

(Oct. 1, 2014 Tr. at 1091-92.)

{¶ 87} As explained above, we conclude that, under the circumstances in this case, the other acts evidence presented in this case shared sufficient common characteristics to be admissible to prove identity through a particular modus operandi.  *See Lowe* at paragraph one of the syllabus.  The trial court's instruction in this case, which was consistent with the model instruction provided in the Ohio Jury Instructions, constituted a proper explanation of the permissible and impermissible uses of the other acts evidence. Therefore, we cannot conclude that the trial court abused its discretion by giving this instruction. *See State v. Hillman*, 10th Dist. No. 14AP-252, 2014-Ohio-5760, ¶ 37.

{¶ 88} Accordingly, we overrule appellant's third assignment of error.

### E. Ineffective Assistance of Counsel

{¶ 89} In his fourth assignment of error, appellant argues that his trial counsel provided ineffective assistance by failing to have a record made of the joinder hearing and by failing to object to opinion testimony and victim impact testimony at trial. As explained above, we apply a two-part standard to claims of ineffective assistance, examining (1) whether counsel's performance was deficient, and (2) whether that deficient performance resulted in prejudice to the defendant. *See Strickland* at 687; *Bradley* at 141-42. A party seeking to show prejudice as a result of counsel's alleged deficient performance at trial must establish that there is a reasonable probability that, but for the unprofessional errors of counsel, the outcome of the trial would have been different. *State v. Phillips*, 10th Dist. No. 14AP-79, 2014-Ohio-5162, ¶ 81. "A reasonable probability is one sufficient to undermine confidence in the outcome." *Id.*, citing *Strickland* at 694.

{¶ 90} For the reasons set forth above, we have concluded that joinder of the indictments was proper in this case. Accordingly, even if appellant's counsel performed deficiently by failing to have a record made of the joinder hearing, appellant cannot demonstrate that he was prejudiced by such deficiency.

{¶ 91} With respect to counsel's failure to object to opinion testimony and victim impact testimony, we note that decisions on trial strategy and tactics are generally granted a wide latitude of professional judgment and it is not our duty to analyze trial counsel's legal tactics and maneuvers. *Id.* at ¶ 86. However, assuming without deciding that appellant's counsel performed deficiently by failing to object to this testimony, we cannot conclude that there is a reasonable probability that the result of the trial would have been different. As discussed more fully below, there was a substantial amount of evidence presented with respect to each of the charges against appellant. Additionally, while the victim impact testimony created a risk of invoking the jurors' sympathies, the testimony constituted a small part of the overall presentation in support of the state's case and must be considered in that broader context. Appellant has failed to demonstrate a reasonable probability that the outcome of the trial would have been different absent the opinion testimony and victim impact testimony.

{¶ 92} Accordingly, we overrule appellant's fourth assignment of error.

### F. Weight and Sufficiency of the Evidence

{¶ 93} Finally, we turn to appellant's fifth and sixth assignments of error, in which he asserts the evidence was insufficient to sustain his convictions and that the judgment was against the manifest weight of the evidence.

{¶ 94} "Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict." *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 36, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In reviewing a challenge to the sufficiency of the evidence, an appellate court must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Where the evidence, "if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt," it is sufficient to sustain a conviction. *Id.*

{¶ 95} Appellant was convicted of 2 counts of robbery with respect to each of the 15 incidents described above. The indictments charged that in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, appellant recklessly inflicted, attempted to inflict, or threatened to inflict physical harm on another, thereby violating R.C. 2911.02(A)(2). The indictments also charged that in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, appellant recklessly used or threatened the immediate use of force against another, thereby violating R.C. 2911.02(A)(3). Appellant was also convicted on one count of kidnapping with respect to the October 10, 2011 Marathon robbery, four counts of kidnapping with respect to the November 8, 2012 Wendy's robbery, and one count of kidnapping with respect to the November 15, 2012 BMV office robbery. With regard to those charges, the indictments asserted that by force, threat, or deception, appellant restrained another of his or her liberty with the purpose to facilitate the commission of the robbery or flight thereafter, thereby violating R.C. 2905.01(A)(2). In the count arising from the October 10, 2011 Marathon robbery, appellant was charged with kidnapping one or both of the employees who were present during the robbery. For the November 8, 2012 Wendy's robbery, appellant was charged with kidnapping four of the employees who

were present during the robbery. Similarly, for the November 15, 2012 BMV office robbery, appellant was charged with kidnapping the office manager who was present during the robbery.

## 1. Sufficiency of evidence related to the November 15, 2012 BMV office robbery

{¶ 96} Appellant does not appear to contest his convictions on the two robbery charges and one kidnapping charge arising from the November 15, 2012 robbery; his brief on appeal only refers to convictions based on the other 14 incidents. Nonetheless, we will briefly review the evidence supporting those convictions. Appellant admitted to committing the November 15, 2012 BMV office robbery in the interrogation video and his counsel acknowledged at trial that appellant committed that robbery. The state presented testimony and evidence demonstrating that appellant entered the BMV office carrying a handgun, pointed that handgun at one or more of the employees, demanded money, and took money from the employees. By taking the money, appellant committed a theft offense. *See, e.g., State v. Green*, 10th Dist. No. 03AP-813, 2004-Ohio-3697, ¶ 11 (explaining that a "theft offense" includes knowingly obtaining or exerting control over property or services without consent of the owner, with purpose to deprive the owner of the property or services).

{¶ 97} The Supreme Court of Ohio has held that "[o]ne cannot display, brandish, indicate possession of, or use a deadly weapon in the context of committing a theft offense without conveying an implied threat to inflict physical harm." *State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, ¶ 23. "It is the very act of displaying, brandishing, indicating possession, or using the weapon that constitutes the threat to inflict harm because it intimidates the victim into complying with the command to relinquish property without consent." *Id.* Thus, there was sufficient evidence to establish that all of the elements of robbery, as defined under R.C. 2911.02(A)(2), were established. Similarly, we conclude that appellant's actions of pointing the gun at the BMV office employees constituted a threat of the immediate use of force against them in the commission of the theft offense, thereby establishing the elements of robbery as defined under R.C. 2911.02(A)(3). *See, e.g., State v. Taylor*, 10th Dist. No. 14AP-254, 2015-Ohio-2490, ¶ 17 (testimony that defendant pointed a gun at victims during robbery, made one victim lie on the ground at

gunpoint, and threatened that accomplice would shoot victims if they got up off the ground was sufficient to support robbery conviction based on use or threat of immediate use of force).

{¶ 98} With respect to the kidnapping charge arising from the November 15, 2012 BMV office robbery, one of the employees present during the robbery testified that when the office manager started to come out of the back room and move toward the front area, appellant pointed his gun at the office manager and told her to go sit down. As the video of the robbery was played for the jury, the employee identified the office manager and demonstrated when appellant told her to go sit down. Thus, there was evidence that to facilitate the commission of the robbery, appellant restrained the liberty of the office manager by ordering her, at gunpoint, to sit down. *See, e.g., State v. Jackson*, 10th Dist. No. 14AP-748, 2015-Ohio-5114, ¶ 21 (holding that evidence was sufficient to support kidnapping conviction where appellant held victims at gunpoint and prevented them from leaving). Therefore, the evidence was sufficient to establish the elements of kidnapping, as defined under R.C. 2905.01(A)(2).

### 2. Sufficiency of evidence related to November 8, 2012 Wendy's robbery

{¶ 99} Appellant was convicted on two counts of robbery and four counts of kidnapping as a result of the November 8, 2012 Wendy's robbery. The state presented evidence and testimony establishing that a masked man entered the Wendy's restaurant, pointed a gun at the manager and instructed all the employees to get on the floor. The restaurant manager testified that the robber compelled her to open the cash registers. The robber took the money from the cash registers and fled the restaurant. The restaurant manager identified herself and the three other employees named in the kidnapping counts as being present during the robbery and testified that they were forced to get on the floor or otherwise prevented from moving about freely. Similar to the reasoning set forth above, we conclude that this evidence was sufficient to demonstrate that the individual depicted in the Wendy's surveillance video committed robbery and kidnapping.

{¶ 100} Appellant, however, asserts that there was not sufficient evidence to establish that he was the individual who committed those crimes. As explained above,

there were numerous similarities between appellant's actions in robbing the BMV office on November 15, 2012, and the conduct of the robber during the November 8, 2012 Wendy's robbery. Both robberies occurred during the evening. Appellant and the Wendy's robber were African-American men who wore dark clothing and masks while committing the robberies. Appellant and the Wendy's robber both wore dark gloves with white markings or letters. Appellant and the Wendy's robber each held a small handgun in the left hand while committing the robberies and each went behind the counter into areas where the public would not normally be present. The restaurant manager testified that the robber was approximately 5'7" and weighed about 200 pounds; there was evidence introduced that appellant was 5'9" and weighed 222 pounds. Additionally, there was evidence from the police license plate reader that appellant's van was in the area near the robbery a few minutes after it occurred. This evidence, viewed in the light most favorable to the prosecution, would be sufficient to establish that appellant committed the robbery and kidnapping on November 8, 2012.

### 3. Sufficiency of the evidence related to the 2011 robberies

{¶ 101} Appellant similarly argues that the evidence was insufficient to establish that he committed the robberies giving rise to the 26 robbery counts and 1 kidnapping count contained in the indictment in case No. 13CR-4174. As set forth above, the state presented evidence and testimony with respect to each incident establishing that an African-American man entered each of the establishments, brandished or pointed a gun at the employees, and demanded money. The robber wore dark clothing and a mask obscuring most of his face. He wore dark gloves with white markings or lettering. He ordered the employees of the various establishments to get on the ground. He carried a gun in his left hand and used his right hand to reach into the cash registers to take money. Ten of the 13 robberies that occurred in 2011 were committed in the evening or at night. In all but the first of the 2011 robberies, the robber jumped over or went behind the counters into areas where the public would not normally be present. As with the November 8, 2012 Wendy's robbery, these characteristics of the individual who committed the 2011 robberies were similar to appellant's actions during the November 15, 2012 BMV office robbery. Additionally, several of the witnesses' descriptions of the robber's height and weight were consistent with appellant's height and weight. With

regard to the kidnapping charge arising from the October 10, 2011 Marathon robbery, one of the employees testified that the robber pushed his fellow employee to the ground, thereby restricting her movement.  This act was also visible on the video that was played for the jury. Viewing all of this evidence in the light most favorable to the prosecution, it was sufficient to establish that appellant committed the crimes for which he was convicted in case No. 13CR-4174.

### 4. Manifest weight of the evidence

{¶ 102}  "While sufficiency of the evidence is a test of adequacy regarding whether the evidence is legally sufficient to support the verdict as a matter of law, the criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *Cassell* at ¶ 38, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 25. "When presented with a challenge to the manifest weight of the evidence, an appellate court may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. McCrary*, 10th Dist. No. 10AP-881, 2011-Ohio-3161, ¶ 12, citing *Thompkins* at 387. This authority " 'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).  In conducting our review of the evidence, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' "  *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶ 103}  In this case, the state set forth extensive evidence and testimony related to each of the robbery incidents. In addition to testimony from at least one employee of each business that was robbed, the state offered into evidence video and or photographic evidence from each of the robberies.  The state also presented the video of appellant's interrogation, in which he admitted to committing the November 15, 2012 BMV office robbery.  Appellant's explanation of his whereabouts on the evening of November 8, 2012

was inconsistent with the evidence showing that his van was near the area of the Wendy's robbery shortly after the robbery occurred.  Appellant stated that he worked out at a fitness center in Worthington and then traveled to a private client's home, which would have required him to travel west, away from the location of the robbery.  However, the location where the license plate reader detected his van was east of the fitness center where he claimed to have worked out.  Appellant also made comments during his interrogation that could be construed to indicate that he had committed other robberies.  As noted above, in several instances the witnesses' descriptions of the robber were consistent with appellant's height and weight.  Based on the record before us, we cannot conclude that the jury clearly lost its way or that the evidence weighed heavily against appellant's convictions.

{¶ 104}  Accordingly, we overrule appellant's fifth and sixth assignments of error.

## IV.  Conclusion

{¶ 105}  For the foregoing reasons, we overrule appellant's six assignments of error and five supplemental assignments of error and affirm the judgments of the Franklin County Court of Common Pleas.

*Judgments affirmed.*

BROWN and LUPER SCHUSTER, JJ., concur.